UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* MELAYNA LOKOSKY,<br>*Plaintiff-Relator*,<br>v.<br>ACCLARENT, INC.,<br>*Defendant*. | No. 1:11-cv-11217-DLC |

**MELAYNA LOKOSKY'S OPPOSITION TO MOTION TO QUASH SUBPOENAS OF FACTEAU AND FABIAN**

Relator Melayna Lokosky makes a simple request: permit her to depose William Facteau and Patrick Fabian in support of her retaliation case. In response, these two key witnesses, themselves criminally convicted with information that Lokosky provided to the Government, seek the court's protection. Not only is there no legal justification for their entreaties, but to indulge them would thwart legitimate discovery and hand Defendant Acclarent a win. If all cases proceeded as Acclarent, Facteau, and Fabian demand, no plaintiff could ever expect justice from the courts. It cannot be that the greater the criminality, the harder the proof.

If this were any ordinary company, it might be fair to ask why a former employee would need to depose a former CEO and VP of Sales. But Acclarent was far from ordinary. It was a small, aggressive company deliberately flouting the rules. Acclarent eventually agreed to settle and pay $18 million on claims that it sold misbranded Stratus devices for off-label uses, causing false claims. As the top two officials in the chain of command, Facteau and Fabian were chiefly responsible for the risky strategy of selling Stratus off-label. Not by accident, the Government prosecuted Facteau and Fabian—and no one else—of illegally marketing Stratus by pairing it with Kenalog-40.

A federal jury found Facteau and Fabian guilty of introducing Stratus into interstate commerce as a misbranded product. The inevitable post-trial motions are pending.

Acclarent was such a small company that Lokosky had regular interactions and communications with Facteau and Fabian. For this reason, Lokosky's need to depose Facteau and Fabian is paramount. The evidence in this case shows that Facteau and Fabian tightly oversaw Acclarent's marketing strategy for Stratus, dictated how Acclarent's sales representatives would be instructed to circumvent the rules, and insisted on consequences for those that stood in the way. Facteau and Fabian may well have valid grounds for invoking their Fifth Amendment rights in answer to *some* questions, and nobody is suggesting that they be deprived of those rights. Like all witnesses, they have the right to invoke the Fifth, but they must do so on the record.

In this light, the motion to quash has little to do with preserving constitutional rights and everything to do with hobbling Lokosky's case. Acclarent has already made Lokosky suffer once for her scruples, firing her from a position that on average paid her $230,000 per year. (Exhibit 37.) Given that her damages expert calculates damages well in excess of $4 million (her back pay damages alone are $3.8 million after the statutory doubling), the stakes are high for Lokosky. (*Id.*) She should not be punished a second time by being denied the opportunity to question the two witnesses.

Nor should Acclarent gain a litigation advantage simply because two of its most culpable employees still face criminal jeopardy. Acclarent's claims of unfair surprise and prejudice are simply gamesmanship. Acclarent has known since April 2018 of Lokosky's desire to depose Facteau and Fabian, and there were specific conversations to fit these depositions into a crowded summer litigation calendar. Indeed, the reason Lokosky sought these depositions in late July (rather than June or early July) was to accommodate the vacation schedules of all counsel. In any event, given the current case schedule, it is unclear what prejudice Acclarent faces: its anticipated summary

judgment motion is not due until November 30, 2018, and in any event the motion is unlikely to turn on anything Facteau and Fabian may or may not say.

The present dispute comes down to whether the Court should apply an exception to the general rule against blanket invocations of the privilege against self-incrimination, effectively limiting Lokosky's access to discovery and trial testimony. As argued below, there are no grounds to depart from the general rule. Lokosky has the right to depose Facteau and Fabian, both of whom will likely be unavailable at trial regardless of the outcome of their criminal cases. If they choose to assert their Fifth Amendment rights, they should do so formally, on the record, in a recorded deposition.

## PROCEDURAL HISTORY

The moving parties recount a selective version of history. Lokosky first alerted Facteau's counsel to a need for a deposition back in April and May 2017. (Exhibits 1 & 2.)[1] Rather than indicating that Facteau would move to quash, his counsel agreed to a June 21, 2017 deposition and agreed to accept service of a subpoena. (Exhibit 2.) He mentioned neither a refusal to sit for a deposition nor an intent to quash the subpoena.

On June 15, 2017, just days before Facteau was to be deposed, the parties filed a joint motion to stay discovery pending resolution of Acclarent's motion to dismiss. The joint motion reported that the majority of witnesses to be deposed reside on the West Coast. In fact, the only witness who does not reside in California or Arizona is Fabian. (Joint Motion, ECF No. 86.) On September 20, 2017, the Court denied Acclarent's motion to dismiss and requested a new scheduling order. The parties filed a joint statement, again indicating Lokosky's plans to "depose five former employees of Acclarent, the majority of whom reside in California or Arizona." (Joint Statement, ECF No. 86.) Lokosky

[1] All exhibit references are to the Declaration of Ilyas J. Rona, which is filed concurrently herewith.

indicated that she would depose Salkeld, Cornish, and Na, all of whom she has since deposed. The only way to arrive at the number five is to include Facteau and Fabian.

Lokosky again reached out to Facteau's counsel in November 2017 and asked for deposition dates in January[2] and February of 2018. Facteau's counsel did not respond. (Exhibit 3.) Lokosky reached out again in March 2018, at which point Facteau's counsel mentioned the Fifth Amendment for the first time. Lokosky served a deposition subpoena on Facteau, but Facteau elected not file a motion to quash at the time.

Nor can Acclarent pretend to be ignorant of Lokosky's intent to depose Facteau and Fabian after March 26, 2018. (*See* ECF No. 114-4 ("[W]e intend to depose: Bill Facteau, Pat Fabian, Chuck Cornish, Matt Salkeld, and Yon Richner. I believe the first four were previously noticed.").) Like Facteau, Acclarent did not seek a protective order then. Instead, it waited four months before indicating that it would join the motion to quash.

In April 2018, Lokosky and Acclarent had detailed conversations about deposition scheduling. Initially, Lokosky indicated that she wanted to "feather in Facteau and Fabian. I am thinking the first week in May (or perhaps after the 19th) for one or both." (Exhibit 4.) After further discussions and clarification of the schedule, which included a hiatus in late June and early July to accommodate the work, travel, and vacation schedules of all counsel, it became clear that the only time to depose Facteau and Fabian was "late July." On May 8, 2018, Lokosky informed counsel for Facteau and Fabian that this was "the only feasible block of time." (Exhibit 5.) Four days later, Acclarent and Facteau responded: "Bill and I have spoken, and he has no objection to pushing off Facteau's deposition." They indicated that they would "reserve the right to object to his

[2] The Court may recall that the parties agreed to try a mediation by no later than Mid-December 2017, and by agreement refrained from active discovery until that mediation occurred. A mediation session took place on November 27, 2017; it was unsuccessful. Lokosky attempted to set up a deposition for Facteau after the mediation but--unfortunately--did not hear back right away.

deposition on grounds *other than timing*." *See, e.g.*, E-mail from Michael Maya to Ilyas J. Rona (May 12, 2017, 11:02 AM EDT), ECF No. 114-3 (emphasis added).

## FACTUAL NEXUS TO FACTEAU AND FABIAN

### A. At Acclarent, Lokosky had frequent contact with Facteau and Fabian.

Acclarent is a small business.[3] And as a small company perennially in startup mode, the corporate totem pole was not very tall. Lokosky's boss was Chuck Cornish; Cornish's boss was Matt Salkeld; Salkeld's boss was VP of Sales Pat Fabian; and Fabian's boss was CEO Bill Facteau. Given this flat corporate structure, Lokosky had direct relationships and interaction with all of them, including both Facteau and Fabian. Indeed, Lokosky had worked directly with CEO Facteau on company projects as early as 2008. For example, they worked together to convince a Phoenix-area doctor to adopt the Stratus device. (Exhibit 6.) When the doctor wanted to meet Facteau in person, Lokosky helped set up a meeting at the corporate headquarters, and Facteau successfully convinced the doctor to undergo "Deliver training," which involved training doctors on the use of Stratus with Kenalog-40. (Exhibits 7 & 8.)

### B. Facteau imposed a corporate culture valuing loyalty and obedience over all else.

As CEO of Acclarent, Facteau believed in the value of loyal employees. (Exhibit 9 ("Cultivate them into Evangelists and have them preach your gospel / ***drink the kool-aid***.").) But his brand of loyalty is a one-way street: he once stated that "I never regretted displacing or firing someone too early." Though not the architect of the Acclarent illegal strategy—that was Josh Makower, who was chairman of the board—Facteau was its quarterback. Facteau embraced the reality of operating in what he called "stealth mode," knowing that this strategy came with "good and bad things." Facteau was clear on his role in the company: "Something that has the potential to significantly impair the Company should be handled by the most senior, capable individual and not

[3] https://www.acclarent.com/job-opportunities

delegated." And most prophetically, Facteau observed—correctly as it would turn out—that "You can be sued by anyone at anytime—be prepared." (Exhibit 9.) It is a fair question whether Facteau believes that an employee who refuses to sell off-label and complains of being pressured to do so is no longer "drinking the Kool-aid" and needs to be fired.

**C. Fabian participated in many of the key events leading to Lokosky's firing.**

Fabian was also involved in many of the key events in this case that resulted in Lokosky's eventual termination. Fabian attended the Western Area meeting where Lokosky first publicly complained about the pressure to sell Stratus off-label. (Complaint, ¶ 70.)[4] After Lokosky complained about off-label marketing and caused a stir, she was put on a performance improvement plan ("PIP"). Fabian was copied on drafts of PIP documents circulated in advance, and his name also appears atop the final PIP document that was given to Lokosky on October 1, 2010. (Exhibit 11.) The same cycle repeated itself when Lokosky was terminated, with Fabian copied on interim drafts and the final termination letter presented to Lokosky. (Exhibit 12.)

**D. Long before they fired Lokosky, Acclarent's senior managers knew that its off-label marketing and sales of Stratus were unlawful and announced a policy of Stratus sales by "Catalogue Only."**

The issues leading up Lokosky's termination started well before the termination. Even before J&J acquired Acclarent, Acclarent knew that its promotion of Stratus was flirting with disaster. Marketing personnel openly discussed that "It is not appropriate for Mkting [*sic*] to manage off-label communications. I understand that we are not a large company, but off-label materials should not be disseminated by the commercial side of the house. ***FDA and DoJ really don't care how small we are***. This is especially important given some of the recent punitive judgments in our industry."(Exhibit 13.)

---

[4] Lokosky deposed her immediate supervisors, Salkeld and Cornish, but neither seemed to remember very much about the event. (*See, e.g.*, Exhibit 10, at 244-47.)

On Friday, March 26, 2010, a company-wide conference call was convened. Facteau announced to Acclarent's sales force that after "careful consideration, and with guidance from J&J, we have decided to cease all promotion of Stratus in the United States." (Exhibits 14 & 15.) From that point on, Stratus would still be on the market, but would only be available for order by catalogue order, *i.e.*, "Catalogue Only."(Exhibits 16 & 36.) Facteau blamed the need for the announcement on the "changing and aggressive external environment at FDA, DOJ, congress, etc." (Exhibits 14 & 15.) Facteau falsely denied that there had been any off-label promotion. (Exhibits 16 & 36.) Even so, he stated that Stratus marketing materials "need to be destroyed." (*Id.*)

**E. Fabian and others devised ways to circumvent the "Catalogue Only" policy and instructed their sales personnel to continue marketing Stratus.**

The next day, Fabian emailed Facteau to tell him that the call "went well given the circumstances," and that he had already received some negative feedback. (Exhibits 15.) By Monday, Fabian had devised ways to circumvent the Catalogue Only directive, including by telling sales personnel to carry Stratus in their car trunks and to continue training physicians on using Stratus. (Exhibits 17.) It does not appear that Fabian sought or received any input from J&J's compliance officers about his strategy. Nevertheless, Fabian justified his directive by predicting that: "Stratus will have a drug indication, set your self [*sic*] up for success by supporting those customers who request your services. Prepare for the future!" Stratus never obtained a drug indication from the FDA.

**F. Lokosky stopped promoting Stratus, and Fabian and Facteau took note.**

Just one month after the Catalogue Only announcement, Lokosky received a request for off-label information from a local pharmacist. Following what she believed at the time was the company directive, she refused to discuss off-label use with the pharmacists and referred the request internally. When no one in the company followed up, she contacted Fabian, who forwarded her plea for help to Facteau. (Exhibits 18.) Facteau noted that the "frustration level" in the field "is building." On June 10, Fabian

wrote to Facteau to suggest simplification of the sales message concerning Stratus "to drive home the message the field is hearing from sales management." Fabian lamented that "on the last call your story about Stryker reps ***going to jail has put many in a permanent state of fear!***" (Exhibits 19.)

**G. Compliance staff began following up about the confusion over Stratus marketing.**

On July 28, 2010, Compliance Officer Judy Fernandez wrote to Facteau and Fabian about problems with Stratus: "It has come to my attention that the field sales organization may be struggling with how to respond to customers when addressing questions that may be off label or related to Stratus. I am hearing that uncertainty may be leading to 'paralysis.'" (Exhibits 20.) Fernandez indicated that she would be addressing the uncertainty at "upcoming area meetings."[5]

At around the same time, J&J's compliance staff were emailing Fabian and others in marketing about setting up meetings to monitor compliance with the "Stratus No Promotion Strategy" and to learn the status of the destruction of Stratus promotional materials. (Exhibits 21 & 22.) Acclarent's response was to slowfoot the interviews and delay reporting until October or November. (Exhibit 22.)

Compliance officers pressed on. In preparation for the area meetings, Fernandez met with Bob Wood, Acclarent's VP of Worldwide Training and Professional Education, on August 21, 2010. After the meeting, Wood wrote a revealing email to Facteau and Fabian. (Exhibit 23.) Wood began with an admission: for 3 months, Fernandez had dictated the rules for not promoting Stratus, and for 3 months, Wood didn't understand the plan. Wood finally understand the plan, and he didn't like it:

> Think for a moment about explaining this at the ***upcoming Area meetings***. Stratus will be the litmus test of the future of every new product Acclarent will bring to the market. You can hear the conversations, "The future is over. With any new

---

[5] It was the Western Area meeting just one month later where the Relator complained about "the substantial pressure" by Acclarent to have representatives to sell off-label, and the resulting confusion and problems. *See* Complaint, ¶ 70. More on that below.

> product in the pipeline, if there is conflict between how we represent that product 'on-label' and how physicians use it, the product will automatically become a 'non-commercial' product where it's on the market but it's not and I have to refer my physician to medical affairs to discuss its 'on-label' application. ***I'm not going to embarrass myself like this***, it sounds like I need to get out of here"! ***You can't put lipstick on this pig***.

(Exhibit 23.) Wood conceded that the "Catalogue Only" announcement "had the positive affect [*sic*] of scaring people straight if they had wondered [*sic*] off the reservation." But he advocated a return to promotion:

> If this situation with Stratus was standard policy for an "off-label" situation we would all understand it and act accordingly. It's not though. It's unprecedented and its impact is unprecedented as well. ***Putting salesmen in a situation where a product is on the market but they are out of compliance for discussion that product's on-label application is untenable and people will continue to feel exposed by their own organization.*** The negative effect on core business will continue as well. Off-label / on-label is manageable, promotion / non-promotion on label is not.

(Exhibit 23.) The upcoming area meetings were "our best opportunity to make this situation make sense and get back to becoming an organization in compliance with labeling and on its way to a billion dollars. If not, pull the product." Wood's proposal was forwarded to Gary Pruden, J&J's then-Wordwide Chairman of its medical device business.[6] The proposal went over like a "lead balloon." (Exhibit 24.)

### H. In late August 2010, Lokosky publicly challenged the stealth promotion of Stratus at an area meeting attended by Fabian.

In August 2010, Lokosky publicly challenged the pressure for stealth promotion of Stratus at an area meeting. Complaint, ¶ 70. After she complained about the mixed messages concerning Stratus, her superiors were "furious." Lokosky has deposed other attendees of the meeting, but their memories are foggy. Salkeld had few specific memories and does not remember Lokosky asking any questions at the meeting.

---

[6] MedCity News, *So long, farewell, J&J won't likely miss you…* (February 10, 2017), available at https://www.jnj.com/our-company/story/purpose-aim-and-robotics-pwc-interviews-j-js-gary-pruden

(Exhibit 10, at 244-47.) Salkeld was the keynote presenter at the area meeting, and he overtly instructed reps to "rebuild Stratus business" in Q3, something that he concedes would be "difficult" to do without violating the "No-Promotion" policy. (Exhibit 10, at 265-66.) Fabian attended the meeting, and by this point he had "intuitively assumed" that "[s]uccessful reps continue to sell Stratus," which drove non-Stratus sales. (Exhibits 25 & 26.) It is thus fair to ask whether Fabian recalls any employees questioning the stealth strategy to promote Stratus that he helped devise back in March.

**I. Still under pressure to sell Stratus off-label, Lokosky involved compliance staff.**

In September 2010, Cornish asked Lokosky to arrange a training program for Stratus and other products called ASSET. Lokosky did what she was asked but "intentionally made sure that the credit card approval for the event would raise red flags." (Exhibit 27.) All hell broke loose. On September 12, 2010, Fernandez wrote expressing numerous concerns about the ASSET program. Her first question was whether this was a "one-time program or a standard Acclarent offering." (Exhibit 28.) This implies that Fernandez had never heard of, much less reviewed and approved of, the ASSET program. Second, she expressed concern about whether the content was "100% on label." Fernandez also noted that there was reference to Stratus promotional materials, which were supposed to have been destroyed back in March. (Exhibit 28.)

Without any investigation, Fabian quickly emailed Fernandez to assure her that there were "no issues with the ASSET program" and that "all material has been routed and approved." (Exhibit 29.) These assertions were false. Fabian then turned his ire towards Lokosky, asking why should couldn't have paid her own expenses "like everyone else." "Tell her to stop buying Jimmy Choo shoes," he complained, "Created a lot of work for everyone else."(Exhibit 30.)

The next day, Wood noted that a "hornet's nest is building around the Phoenix ASSET program" and complained that he would need to "write a report on 'what

ASSET is and … how ASSET is being rolled out universally.'" (Exhibit 31.) Undercutting Fabian's email from the day before, Wood sent a report to Fernandez conceding that the ASSET program did in fact have off-label content but was "satisfied that if the alarm had not gone off Chuck [Cornish] would have made the correct calls on questioning the promotional / off-label ideas that were incorporated and take the appropriate action to both educate Melayna on what we can and cannot do as well as insure the course stayed in compliance . . . ." (Exhibit 28.) Interestingly, Lokosky was never criticized or disciplined for proposing off-label content.

**J. Acclarent retaliated against Lokosky.**

On September 28, 2010, Salkeld, Acclarent's then-HR director, informed Fabian that Lokosky would be put on a PIP due to supposedly poor sales. According to the former HR director, if senior management "didn't like you, you were put on a plan. If they didn't like you for some reason or another. Maybe if you're not part of the herd, didn't want to go and listen, Pat Fabian had something against you . . . . I've seen that too." (Exhibit 33, at 53-54.) It is worth noting that none of the employees ranked below her in sales were placed on a PIP. Salkeld and Cornish presented the PIP to Lokosky in person on October 1, 2010, copying Fabian. (Exhibit 11.) Lokosky responded on October 13, 2010 with a letter accusing her managers of "retaliation," "harassment," "discrimination," and unfair treatment. Fabian's response was: "YAAAAAAAAAAA-AAAAAAAAAAAAAAAAAAAAAAAAAAA." (Exhibit 34.) Interestingly, the HR department never asked Lokosky what she believed she had done to prompt retaliation. By October 22, 2010, Fabian was stepping up the promotion of Stratus, instructing area leaders to review the Stratus Rules of Engagement "every Monday starting this Monday until the end of time" to "Proactively get in front of every customer." (Exhibit 35.)

On January 2, 2011, Salkeld sent Fabian a draft of the Lokosky termination letter. Fabian was also copied on the final January 5, 2011 termination letter. (Exhibit 12.)

**K. Acclarent hired a qualified candidate to replace Lokosky, but then revoked that offer when it learned that the candidate was also a whistleblower.**

One month after Lokosky's termination, Acclarent interviewed Ryan Tinsley for the Arizona vacancy. Tinsley came highly credentialed and breezed through the interview process, background check, and drug screen. On the Friday before Tinsley was to begin work, Acclarent rescinded the offer of employment and asked for his laptop and iPad to be mailed back. Despite repeated requests from Tinsley, Acclarent would never explain to him why it revoked his offer. (Exhibit 38.) As it turns out, the real reason was because Facteau—while golfing—had learned that Tinsley was the Allergan whistleblower,[7] and Facteau had instructed Acclarent to withdraw the offer of employment to avoid having another whistleblower on payroll. (Exhibit 38.)

## ARGUMENT

Acclarent wants to have its cake and eat it too. Acclarent wants Facteau and Fabian to avoid questioning by noting that they will invoke the privilege against self-incrimination. Yet Acclarent also does not want Facteau and Fabian to invoke the privilege under questioning, instead opting for an unusual "blanket" invocation of the privilege and thus avoiding any adverse consequences of invocation. In reality, Acclarent and its former executives are trying to hobble Lokosky's case. Their claims of prejudice are non-existent and contrived. Facteau and Fabian have already sat through a 27-day trial that stretched out over 6 weeks. There is no prejudice to having them sit through what will be—if their lawyers are correct—a short one-day deposition. For the reasons argued below, the Court should deny the motion to quash.

---

[7] Department of Justice, Allergan To Pay $3.5 Million To Settle False Claims Act Allegations Relating To LAP-BAND Bariatric Medical Device, https://www.justice.gov/usao-md/pr/allergan-pay-35-million-settle-false-claims-act-allegations-relating-lap-band-bariatric

**I. Relator's right to discovery entitles her to answers to her deposition questions or an on-the-record privilege invocation by the witnesses.**

The motion to quash seeks to abridge Lokosky's right to obtain discovery to assist her retaliation claim against Acclarent. Once a party has stated a valid claim, that party has a right to obtain discovery "regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." *See* Fed. R. Civ. P. 26(b)(1); *cf. Anderson v. Cryovac, Inc.*, 805 F.2d 1, 12 (1st Cir. 1986) ("[T]he parties are given broad range to explore 'any matter, not privileged, which is relevant to the subject matter involved in the pending action' so that they may narrow and clarify the issues and obtain evidence or information leading to the discovery of evidence for future use in the trial.") (quoting Fed. R. Civ. P. 26(b)(1) (1983)). Here, Lokosky seeks to depose Facteau and Fabian on an issue directly relevant to her retaliation claim.

As Lokosky's complaint made clear, Facteau and Fabian were involved in the decision to terminate her. In paragraph 71, Lokosky alleges that the decision to terminate her separately involved "her boss" (Cornish, who has been deposed), the "high level official who in July 2010 had insisted that she sell off-label" (Salkeld, who has also been deposed), and other "senior managers" referred in the paragraph. (Compl. ¶ 71.) A plain reading of the complaint suggests that there were other senior managers involved. Who else could those "senior managers" be? The only chain of command was Cornish, Salkeld, Fabian, and Facteau. Lokosky is entitled to know to what extent Facteau and Fabian were involved in the decision to terminate her.

Discovery to date has revealed that both Facteau and Fabian played a role in Lokosky's firing. Acclarent had given its salespeople mixed messages about what they could say about Stratus. Lokosky complained about these mixed messages, and Fabian forwarded Lokosky's complaints to Facteau. When Lokosky's actions drew the attention of J&J's compliance team, Fabian complained directly about Lokosky in an email to Lokosky's direct supervisor. Within the month, Fabian was informed that

Lokosky would be placed on a PIP, on which Fabian's name appears. Facteau and Fabian were briefed on Acclarent's investigation into Lokosky's performance, and they met with the VP of Human Resources to discuss the investigation. Fabian also reviewed at least one draft of the termination letter that was ultimately sent to Lokosky and copied to Fabian. Any broad claim that Facteau and Fabian possess no discoverable information relevant to Lokosky's claim is uninformed at best and dissembling at worst.

The depositions are also proportional to the needs of the case. In analyzing proportionality, courts should consider "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). The stakes here are high: expert analysis[8] suggests that the amount in controversy exceeds $4 million dollars, representing an entire career destroyed. The issues at stake are likewise weighty as they concern the False Claims Act's anti-retaliation provisions necessary to protect whistleblowers from unscrupulous employers. In this context, the cost of the proposed depositions is unremarkable. Although the depositions would be taken out of state, Acclarent is a company with millions in annual revenue and can clearly afford to attend if it chooses to. Facteau and Fabian's information is also uniquely in their possession—they no longer work for Acclarent, and neither party has direct access to them. A deposition provides both parties an opportunity to clarify what Facteau and Fabian know. And the notion that Facteau and Fabian would be burdened by "hours" of invoking the Fifth is overly dramatic given that they already sat through a six-week trial.

And a brief word on the documents requested: it is hardly unusual to require individual deponents to bring documents and other records to a deposition. If the

[8] (Exhibit 37.)

volume of responsive records is high and Facteau and Fabian need more time to collect the documents, Lokosky can accommodate reasonable extensions, just as she has accommodated their prior requests to postpone the depositions. But if Facteau and Fabian truly believed the scope of the request was too broad, they could have asked Lokosky to further narrow the already tailored request; they didn't. Instead, Facteau and Fabian now gamble on an all-or-nothing approach, insisting on a blanket refusal to produce ***any*** documents that is more unreasonable than a demand for relevant documents could ever be. For these reasons, the Court should deny the motion to quash.

**II. A possible invocation of the privilege against self-incrimination does not obviate the need for an actual invocation of the privilege to specific questions.**

The moving parties claim that if deposed, Facteau and Fabian intend to invoke the privilege against self-incrimination, and that this intended invocation renders Lokosky's requested depositions useless and a waste of time. In support of this argument, the moving parties cite an unpublished decision wherein Judge Boal stayed depositions during the pendency of a parallel criminal prosecution. (*See, e.g.*, Mem. Supp. Non-Parties Facteau & Fabian's Joint Mot. Quash at 1–2, Aug. 6, 2018, ECF No. 112.) The Court should reject such a controversial argument because it is contrary to the law and posits that a proclaimed intent to invoke a privilege is sufficient to take the place of an actual invocation.

The privilege against self-incrimination "cannot be invoked on a blanket basis." *Vazquez-Rijos v. Anhnag*, 654 F.3d 122, 129 (1st Cir. 2011); *United States v. Castro*, 129 F.3d 226, 229 (1st Cir. 1997) ("The privilege cannot be invoked on a blanket basis."); *In re Grand Jury Matters*, 751 F.2d 13, 17 n.4 (1st Cir. 1984) ("It is well established that 'blanket assertions of privilege . . . are extremely disfavored' . . . .") (quoting *In re Grand Jury Witness*, 695 F.2d 359, 362 (9th Cir. 1982)). Rather, it must be invoked in response to specific questions. *Id.; see also SEC v. Spencer Pharm., Inc.*, No. 12-cv-12334, 2014 WL

4179914 (D. Mass. Aug. 19, 2014). "This rule makes practical sense [because] [t]he trial court must be able to review whether the privilege was properly invoked." *Vazquez-Rijos*, 654 F.3d at 129. This rule also dovetails with the prevailing law on drawing adverse inferences from invocations of the privilege: an adverse inference can only be drawn for the questions that the witness refuses to answer. *See United States v. 62,552.00 in U.S. Currency*, No. 03-10153-RBC, 2015 U.S. Dist. LEXIS 6280, at *22 (D. Mass. Jan. 20, 2015) ("[I]t is not possible to draw a sort of blanket adverse inference on the ground that the witness refused to answer questions on a particular subject matter."). Applying this general rule, the Court should deny the request to quash.

To skirt the general rule, the moving parties ask the Court to apply an exception recognized in some courts that a blanket invocation is permissible in the "unusual" case where answering "*any* relevant question" poses a reasonable risk of danger. *See* Mem. & Order at 13, *In re: New England Compounding Pharmacy, Inc., Products Liability Litigation* (*NECC Litigation*), No. 1:13-md-02419-RWZ (July 31, 2015), ECF No. 2123 (quoting *United States v. Ortiz*, 82 F.3d 1066, 1073 (D.C. Cir. 1996)) (unpublished). The *NECC Litigation* presented the issue of whether a court should issue protective orders to stay depositions of parties whose Fifth Amendment rights were necessarily implicated in their testimony. *See* Mem. & Order at 10, *NECC Litigation*, *supra*. There, a series of individuals had been indicted in a criminal action and also sued civilly for overlapping conduct. *Id.* at 1. Plaintiffs sought to depose several of the civil defendants, all but one of whom were also under indictment. *See id.* at 10. Plaintiffs also sought to depose an unindicted non-party to the civil suit. *See id.* at 11. Judge Boal acknowledged that all of the potential deponents were "entitled to invoke the Fifth Amendment privilege against self-incrimination during their depositions." *Id.* at 15-16. In fact, the civil defendants had already invoked the privilege against self-incrimination in their responses to specific questions in the interrogatories and requests for admissions that plaintiffs had propounded. *Id.* at 10. But rather than staying all depositions, the court stayed only the

depositions for the civil defendants who were also under indictment, *and only until* "resolution of the criminal charges." *See id.* at 15-16. By contrast, the court declined to stay the depositions against an unindicted civil defendant and a non-party. *Id.* at 16. Noting their claim to be weaker, the court indicated that they could nonetheless invoke the privilege on a question-by-question basis. *Id.* at 16-17.

Unlike the defendants who obtained a stay in the *NECC Litigation*, Facteau and Fabian are not parties to the civil litigation, have not yet invoked the privilege against self-incrimination in a written pleading or under oath, and have not been asked to answer any substantive questions. Lokosky's civil claims are now nearing their seventh anniversary and are not susceptible to any further significant delay.[9] Facteau and Fabian have already been tried and convicted criminally—there is no guarantee that they will receive a new trial. Even if their motion for new trial could revive the concerns of self-incrimination, they would still have the ability and right to invoke the privilege in response to any specific questions where the potential for self-incrimination arises. *See SEC v. Pence*, No. 15-cv-7077, 2017 WL 49977792 (S.D.N.Y. Oct. 31, 2017).

Finally, a deposition bar would prejudice Lokosky more than a question-by-question invocation of the privilege would prejudice Facteau and Fabian, if it prejudices them at all. Facteau and Fabian can preserve their rights by invoking the privilege in response to specific questions. Meanwhile, Lokosky needs to complete discovery in her aging civil case, and Facteau and Fabian are key witnesses whose testimony is needed. Furthermore, if the Court quashes the depositions altogether, it would deprive Lokosky of the adverse inference that may be drawn from invocations of the privilege to individual questions at a deposition. Goliath does not get to tie David's hand behind his back before the fight. The Court should therefore deny the motion to quash.

---

[9] In any event, if Facteau and Fabian's position were correct, the appropriate procedural move would have been to ask for a stay. For whatever reason, they chose not to ask for one.

## III. An invocation of the privilege against self-incrimination by Facteau and Fabian supports an adverse inference against Acclarent.

Acclarent's memorandum intimates that no adverse inference can be drawn from the invocation of privilege because "Acclarent has no employment relationship with Facteau or Fabian for several years, Acclarent does not control them, the witnesses have no interest in the outcome of this case, and their testimony is not central to the case." (Acclarent's Mem. Supp. Mot. by Facteau and Fabian to Quash Subpoenas at 5, Aug. 6, 2018, ECF No. 114 (citing *United States v. 62,552.00 in U.S. Currency*, No. 03-10153-RBC, 2015 U.S. Dist. LEXIS 6280 (D. Mass. Jan. 20, 2015)).) There is no merit to Acclarent's contention, as its own case law makes clear.

Although the First Circuit does not appear to have addressed the issue directly, Judge Collings identified four non-exclusive factors other courts have applied in analyzing whether an adverse inference is "trustworthy" and therefore appropriate: "(1) the nature of the relevant relationships; (2) the degree of control of the party over the nonparty witness; (3) the compatibility of the interests of the party and non-party witness in the outcome of the litigation; and (4) the role of the non-party witness in the litigation." *See 62,552.00 in U.S. Currency*, 2015 U.S. Dist. LEXIS 6280, at *16-17.

In *62,552.00 in U.S. Currency*, the court applied these factors in a civil forfeiture action. There, the Government sought to forfeit certain currency it had seized from the claimant and her live-in boyfriend when they attempted to board a flight to the Dominican Republic. *Id.* at *1-2. The evidence showed that the boyfriend worked with the claimant in a "shipping venture" that would help transport goods to the Dominican Republic for a fee. *Id.* at *22. In deposition, the boyfriend repeatedly refused to answer questions "relating to this trip, the seized currency or the facts surrounding the seizure of the money." *Id.* The Court found that the relationship between the claimant and boyfriend to be close; that the claimant controlled the boyfriend "vis-a-vis the [shipping] business;" and that their interests were therefore compatible. *Id.* The court

thus noted that an adverse inference as to specific questions that the boyfriend refused to answer would have been trustworthy. *See id.*

Here, all factors similarly weigh in favor of trustworthiness. At all times relevant to the subject matter of this litigation—as well as the parallel criminal case—Facteau and Fabian were senior executives or employees of Defendant Acclarent—one as its CEO and the other as its VP of Sales. In other words, they served at Acclarent's pleasure. As their principal, Acclarent is also subject to vicarious liability for their wrongs, *see United States v. O'Connell*, 890 F.2d 563, 568 (1st Cir. 1989) ("There is nothing in the language of the [False Claims] Act proscribing vicarious liability."), and they, in turn, are liable to Acclarent. *Cf. Restatement (Second) of Agency* § 401 (1958) ("An agent is subject to liability for loss caused to the principal by any breach of duty."). Consequently, they have interests so closely aligned such that they both benefit if Acclarent is found not to be liable, and they both may suffer if Acclarent is found responsible. Both Facteau and Fabian played direct roles the law-breaking culture at Acclarent that led to Lokosky's termination—this is the essence of her retaliation claim. Even the actions that exposed them to potential criminal sanctions relate to Lokosky's retaliation claim. Any adverse inference—to specific questions that Facteau and Fabian refuse to answer—are trustworthy and appropriate. The Court should therefore deny the motion to quash.

## CONCLUSION

For these reasons, Lokosky requests that the Court deny Facteau and Fabian's motion to quash.

Respectfully submitted,

RELATOR MELAYNA LOKOSKY

By her attorneys,

Dated: August 20, 2018

/s/ Ilyas J. Rona

Ilyas J. Rona, Esq. (BBO #642964)
Royston H. Delaney, Esq. (BBO #655666)
DELANEY KESTER LLP
50 Congress Street, Suite 600
Boston, Massachusetts 02109
Tel: (857) 498-0384
ilyas@delaneykester.com
royston@delaneykester.com

*-and-*

Charles F. Kester, Esq.
DELANEY KESTER LLP
4505 Las Virgenes Road, Suite 203
Calabasas, California 91302
Tel: (818) 974-8627
charles@delaneykester.com

*-and-*

Jin-Ho King, Esq. (BBO #679528)
MILLIGAN RONA DURAN & KING LLC
50 Congress Street, Suite 600
Boston, Massachusetts 02109
Tel: (617) 395-9570 x104
jhk@mrdklaw.com

**CERTIFICATE OF SERVICE**

I, Ilyas J. Rona, hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on August 24, 2018.

Dated: August 24, 2018

/s/ Ilyas J. Rona

Ilyas J. Rona, Esq.