UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA, *ex rel.*
MELAYNA LOKOSKY,

       Plaintiff-Relator,

v.

ACCLARENT, INC.,

       Defendant.

No. 1:11-cv-11217-DLC

## MEMORANDUM AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

CABELL, U.S.M.J.

Plaintiff Melayna Lokosky ("Lokosky") contends that defendant Acclarent, Inc. ("Acclarent"), a medical device company, terminated her employment because she was reluctant to promote one of Acclarent's sinus-related products, the Relieva Stratus Microflow Spacer ("Stratus"), for an off-label use, meaning a use other than that for which it was approved by the Food and Drug Administration ("FDA"). The complaint asserts a claim for retaliatory discharge in violation of the False Claims Act, 32 U.S.C. §§ 3729-33 ("FCA"), and a state law claim for wrongful discharge.[1] Acclarent moved for summary judgment on both claims,

---

[1] The complaint also asserts two claims on behalf of the United States against Acclarent and related entities regarding violations of the False Claims Act, 31 U.S.C. § 3729, that allegedly stemmed from Acclarent's off-label Stratus sales. (Dkt. No. 1, ¶¶ 82-87). The parties have settled those claims. (Dkt. No. 46).

and the plaintiff opposed.   (Dkt. No. 125; Dkt. No. 133).
Following a hearing, the court entered an electronic order granting
Acclarent's motion as to Lokosky's FCA retaliation claim and
denying it as to the wrongful discharge claim.   (Dkt. No. 148).
For the following reasons, the court now vacates that electronic
order and grants Acclarent's motion for summary judgment in full.

I.   **RELEVANT BACKGROUND**

The following facts are undisputed unless otherwise noted.
Where there is a dispute, the court sets the facts out in the light
most favorable to the plaintiff as the non-moving party.   *See
Bienkowski v. Northeastern Univ.*, 285 F.3d 138, 140 (1st Cir.
2002).

Lokosky began working as a sales representative for Acclarent
in 2007.   (Dkt. No. 125, Defendant's Memorandum and Statement of
Undisputed Facts, p. 2, ¶ 2).   Throughout her employment with
Acclarent, Lokosky lived in Arizona, and her sales territory was
in Arizona.   (Dkt. No. 126, p. 2, ¶ 3).   In 2008, Acclarent began
promoting and selling Stratus, a hollow sinus spacer with a fluid
reservoir and tiny pores.[2]   The FDA approved Stratus for use solely
to deliver saline, but Acclarent instead marketed Stratus as a

_____

[2] The parties' statements of facts are both silent as to the FDA approval
timeline for Stratus and when exactly Acclarent began selling Stratus.  As the
parties appear to agree on these noncritical details, the court includes them
here solely for context.

2

device for delivering Kenalog-40, a viscous steroid.  There is no dispute that this promotion of Stratus was for an off-label use.

Johnson & Johnson (J&J) acquired Acclarent in 2010.  Shortly after the acquisition, J&J announced internally that Acclarent was to stop promoting Stratus, citing regulatory concerns about off-label marketing.  (Dkt. No. 134, Plaintiff's Statement of Undisputed Facts, ¶ 78).  Lokosky alleges that, notwithstanding this announcement, Acclarent management continued pushing sales representatives, including Lokosky, to market Stratus off-label. (*Id.* at ¶¶ 80-83).  Despite that pressure, Lokosky refused to market Stratus off-label, and her sales figures suffered as a result.  (Dkt. No. 133-3, Second Deposition of Melayna Lokosky, pp. 77:7-78:21).

Beyond refusing to sell Stratus herself, Lokosky took certain actions in an attempt to raise the off-label marketing issue with both Acclarent and J&J management.  In a telephone conversation occurring between March and July 2010, Lokosky asked her immediate supervisor, Chuck Cornish, why Stratus was still available "by catalog" (i.e., for physicians to order directly from the company) when sales representatives had been directed to destroy their Stratus marketing materials.  (Dkt. No. 126, p. 8, ¶ 47).

Later in July, during a "ride along" with Western Area Sales Director Matthew Salkeld, Lokosky complained about receiving conflicting information on how to market Stratus.  (*Id.* at ¶¶ 49-

3

50).  Salkeld told Lokosky to go back to selling Stratus off-label as she had done before the *J&J* acquisition.  (*Id.* at ¶ 51).

In August or September 2010, at the Western Area sales meeting, a J&J compliance officer spoke about the catalog-only policy regarding Stratus.  (*Id.* at p. 9, ¶ 54).  Lokosky asked the compliance officer numerous questions about what the company's medical officer would say to customers who called about ordering Stratus, allegedly intending to signal that sales representatives were receiving inconsistent direction about marketing Stratus. (*Id.* at ¶ 56; Dkt. No. 134, ¶¶ 56-57).  According to Lokosky, these questions prompted the compliance officer to remain at the meeting for a second day, frustrating plans from Acclarent managers to convene a session outside of J&J's presence about how to market Stratus off-label.  (Dkt. No. 134, ¶ 1).[3]

Finally, on another occasion in September 2010, Lokosky was tasked with organizing a training program for surgical technicians that she believed would involve marketing Stratus off-label.  (Dkt. No. 133-3, pp. 129:20-132:15).  She requested permission to charge event expenses to her corporate credit card rather than charging them to her personal card and seeking reimbursement later, as she

---

[3] Lokosky's Statement of Undisputed Facts cites to the complaint as support for the proposition that her questions prevented this planned session.  Untested assertions in a complaint are insufficient to support a factual position at the summary judgment stage, at least where (as here) the opposing party does not admit to the assertions.  *See* Fed. R. Civ. P. 56(c)(1)(A).  Nonetheless, because this fact is ultimately immaterial, the court includes it here for context and does not comment on it further.

normally would.  (*Id.* at pp. 132:16-133:1).  She allegedly hoped
that this would draw J&J's attention to the event and generate
questions about the event's propriety, which it did.  (Dkt. No.
126, p. 9, ¶ 61; Dkt. No. 133-4).  In making the request, though,
Lokosky did not voice her concerns about off-label marketing,
instead justifying the request by explaining that she was not in
a financial position to charge the expenses to her personal credit
card.  (Dkt. No. 126, p. 9, ¶¶ 59, 61).

On October 1, 2010, Cornish and Salkeld met with Lokosky and
placed her on a Performance Improvement Plan (PIP), ostensibly
because she missed her sales quota for the first three quarters of
2010 and failed to complete certain market development goals.  (*Id.*
at p. 10, ¶ 63; Dkt. No. 126-20).  Lokosky was previously placed
on a similar PIP in November 2008, which she completed.  (Dkt. No.
126, pp. 2-3, ¶¶ 6-8; Dkt. No. 126-5).  She maintains that
Acclarent placed her on the 2010 PIP in retaliation for her efforts
to draw attention to off-label marketing.  (Dkt. No. 134, ¶¶ 21,
30).

On October 7, 2010, Lokosky met with Cornish again.  (Dkt.
No. 134, ¶¶ 34, 63).  She surreptitiously recorded this meeting.
(*Id.* at ¶ 34).  During the meeting, Lokosky complained about being
unfairly penalized for her low Stratus sales given that she
"stopped promoting [it] because we were asked to stop promoting
it."  (Dkt. No. 133-15, Transcript of Recording Excerpt, p. 3:14-

15).   When  Cornish  indicated  that  Lokosky  could  still  market
Stratus  to  existing  customers,  she  replied  that  she  could  only
legally  sell  Stratus  to  those  customers  if  they  brought  it  up
first.   (*Id.* at pp. 3:16-4:1).   Lokosky  expressed  a  concern  that
she  "could  be  sued"  for  promoting  Stratus  with  steroids.   (*Id.* at
p.  4:12-14).   She  went  on  to  tell  Cornish,  "the  company  would  not
support  [sales  representatives]  if  we  got  sued,  about  something  if
it  was  Kenalog  blindness  or  anything  like  that,  they  would  throw
their  hands  up  and  say  that's  it,  we  are  done.   You  expect  us  to
take  personal  responsibility  for  something  that  the  company  won't
do."   (*Id.* at p. 5:2-7).

On October 13, 2010, Lokosky sent a letter responding to her
PIP  to  Salkeld  and  other  Acclarent  managers.   (Dkt.  No.  126,  p.  6,
¶  33;  Dkt.  No.  126-29).   In  her  letter,  Lokosky  alleged  that
Cornish  placed  her  on  the  PIP  in  retaliation  for  previous  reports
she had made about Cornish harassing her, beginning in 2008.  (Dkt.
No.  126-29).   She  further  alleged  that  the  PIP  violated  "the  EEOC
(Title  VII)"  because  the  expectations  it  set  out  were
"inconsistent,  subjective  and  unattainable."   (*Id.* at p. 4).
Lokosky  also  alleged  that  Cornish  discriminated  against  her  based
on  her  gender  and  created  a  hostile  work  environment.   (Dkt.  No.
126,  p.  6,  ¶  35;  Dkt.  No.  126-29,  p.  2).

In December 2010, Lokosky met with Acclarent's Vice President
of  Human  Resources  to  discuss  her  harassment  and  discrimination

claims.  (Dkt. No. 126, p. 10, ¶ 63).  When testifying about this meeting in her (second) deposition, Lokosky could not recall mentioning anything specific about off-label marketing.  (*Id.*). She did believe that she mentioned inconsistencies in the instructions she was receiving from J&J and Acclarent.  (Dkt. No. 133-3, pp. 160:13-161:5).  After an investigation, Acclarent found that the allegations in Lokosky's letter were unsubstantiated. (Dkt. No. 126-30).

Lokosky did not complete her PIP in the 90-day period.  (Dkt. No. 126, pp. 6-7, ¶ 37).  Acclarent terminated her employment on January 4, 2011.  (*Id.* at p. 7, ¶ 39).

Notably, when asked in her deposition, Lokosky could not recall specifically raising concerns about the submission of false claims at any point during her tenure with Acclarent.  (Dkt. No. 133-3, p. 84:10-14).

## II.  LEGAL STANDARD

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). The moving party bears the initial burden of "assert[ing] the absence of a genuine issue of material fact and then support[ing] that assertion by affidavits, admissions, or other materials of evidentiary quality."  *Mulvihill v. Top-Flite Golf Co.*, 335 F.3d 15, 19 (1st Cir. 2003).  "An issue is 'genuine' if it can be

'resolved in favor of either party,' and a fact is 'material' if it 'has the potential of affecting the outcome of the case.'" *Feliciano-Muñoz v. Rebarber-Ocasio*, 970 F.3d 53, 62 (1st Cir. 2020) (quoting *Tang v. Citizens Bank, N.A.*, 821 F.3d 206, 215 (1st Cir. 2016)).

Once the moving party meets its initial burden, the opposing party "bears the burden of producing specific facts sufficient to defeat summary judgment." *González-Cabán v. JR Seafood Inc.*, 48 F.4th 10, 14 (1st Cir. 2022) (internal quotations omitted). More narrowly, the opposing party must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." *Clifford v. Barnhart*, 449 F.3d 276, 280 (1st Cir. 2006) (internal quotation omitted); *see Pleasantdale Condominiums, LLC v. Wakefield*, 37 F.4th 728, 733 (1st Cir. 2022) (quoting *Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991)) (At summary judgment, the nonmovant "must present definite, competent evidence" on "issues where [he] bears the ultimate burden of proof."); *see also Ingram v. Brink's, Inc.*, 414 F.3d 222, 229 (1st Cir. 2005) ("[S]ummary judgment cannot be defeated by relying on improbable inferences, conclusory allegations, or rank speculation."). Ultimately, the court must "view the record in the light most favorable to the non-moving party and resolve all reasonable inferences in its favor, without weighing the evidence or evaluating the credibility of the witnesses." *Sheehan v. The*

*N. Am. Mktg. Corp.*, 610 F.3d 144, 149 (1st Cir. 2010) (citing

*Clifford*, 449 F.3d at 280).

## III. DISCUSSION

### A.   FCA Retaliation

The anti-retaliation section of the FCA provides that

> [a]ny employee, contractor, or agent shall be entitled
> to all relief necessary to make that employee,
> contractor, or agent whole, if that employee,
> contractor, or agent is discharged, demoted, suspended,
> threatened, harassed, or in any other manner
> discriminated against in the terms and conditions of
> employment because of lawful acts done by the employee,
> contractor, agent or associated others in furtherance of
> an action under this section or other efforts to stop 1
> or more violations of this subchapter.

31 U.S.C. § 3730(h)(1).  The protected "lawful acts" include

"internal reporting or objecting to employer directives, which

might not be [done] in direct furtherance of an actual lawsuit."

*United States ex rel. Booker v. Pfizer, Inc.*, 847 F.3d 52, 59 n.8

(1st Cir. 2017).  Phrased differently, the provision prohibits an

employer from discharging or otherwise retaliating against an

employee who complains internally about the employer's FCA

violations, even if the complaints are unconnected to a lawsuit

about the violations themselves.

"To prevail on an FCA retaliation claim, 'a plaintiff must

show that [1] the employee's conduct was protected under the FCA;

[2] the employer knew that the employee was engaged in such

conduct; and [3] the employer discharged or discriminated against

the employee because of his or her protected conduct.'" *Guilfoile v. Shields*, 913 F.3d 178, 187-88 (1st Cir. 2019) (quoting *United States ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 235 (1st Cir. 2004)). As to the third element, the plaintiff must show that her protected conduct was a but-for cause of the adverse employment action. *Lestage v. Coloplast Corp.*, 982 F.3d 37, 46 (1st Cir. 2020).[4]

On the record before the court, even taking the facts in the light most favorable to her, Lokosky's FCA retaliation claim cannot survive summary judgment because, as discussed below, there is no genuine dispute that Lokosky's conduct was not protected under the FCA.

"[C]onduct protected by the FCA is limited to activities that reasonably could lead to an FCA action; in other words, investigations, inquiries, testimonies or other activities that concern the employer's knowing submission of false or fraudulent claims for payment to the government." *Karvelas*, 360 F.3d at 237 (internal quotation marks omitted), *abrogated on other grounds by Allison Engine Co. v. U.S. ex rel. Sanders*, 553 U.S. 662 (2008);

---

[4] FCA retaliation claims follow the familiar *McDonnell-Douglas* burden-shifting framework. *Lestage*, 982 F.3d at 47 (citing *Harrington v. Aggregate Indus. N.E. Region, Inc.*, 668 F.3d 25, 30-31 (1st Cir. 2012)). Under this framework, once a plaintiff establishes a prima facie case of retaliation, satisfying the three elements described above, "the burden shifts to the employer to articulate a non-retaliatory reason for the adverse employment action." *Id.* If the employer articulates such a reason, the burden shifts back to the plaintiff to show that the proffered reason is pretextual. *Id.* Because the plaintiff here cannot establish a prima facie case of retaliation, the court need not reach the latter two steps of the framework.

*see also Booker*, 847 F.3d at 59 n.8 (*Karvelas*'s interpretation of FCA's retaliation provision is consistent with Congress's subsequent amendment of the provision, and thus remains good law). "Although internal reporting may constitute protected activity, the internal reports must allege fraud on the government." *McKenzie v. BellSouth Telecomms., Inc.*, 219 F.3d 508, 516 (6th Cir. 2000), cited with approval by *Karvelas*, 360 F.3d at 237. However, the plaintiff "need not have *known* that [her] actions could lead to a qui tam suit under the FCA, or even that a False Claims Act existed, in order to demonstrate that [s]he engaged in protected conduct."  *Karvelas*, 360 F.3d at 237 (emphasis in original).

Two cases provide substantial guidance in delimiting the scope of protected conduct under the FCA.  In *Karvelas*, the relator worked as a respiratory therapist at a hospital.  *Id.* at 223.  The relator claimed that the hospital discharged him in retaliation for his protected conduct, namely "his investigation of the defendants' noncompliance with regulatory standards and violations of the FCA."  *Id.*  More specifically, the relator argued that he engaged in protected conduct by witnessing and reporting on two categories of misconduct: (1) various failures to meet patient care and documentation standards, including "the failure to meet regulatory standards which are required for reimbursement by Medicare and Medicaid," and (2) "directives . . . to complete

patient evaluations even if the patients had been discharged or had died," with the evaluations subsequently being billed to Medicare or Medicaid. *Id.* at 237. The First Circuit found that the first category did not qualify as protected conduct because, "[a]lthough [c]orrecting regulatory problems may be a laudable goal, it is not actionable under the FCA in the absence of actual fraudulent conduct." *Id.* (internal quotation marks omitted) (second alteration in original). In other words, the conduct was not protected under the FCA because it did not involve "investigation or reporting of false or fraudulent claims knowingly submitted to the government." *Id.* The second category, however, did qualify as protected conduct because the relator "notif[ied] his employers about fraudulent claims for payment that the Hospital knowingly submitted to the government." *Id.* at 239.

In *Booker*, the relators contended that Pfizer terminated Booker, a sales representative, "in retaliation for two instances in which Booker complained to his superiors that the company was continuing to promote [its drug] Geodon for off-label uses after [a] settlement" between Pfizer and the United States regarding similar FCA violations. 847 F.3d at 59. The First Circuit affirmed a summary judgment ruling in favor of Pfizer, finding that, "[e]ven accepting that Booker's objections to the directions [from his supervisors] were concerned with off-label promotion,

such objections, without more, are not enough under *Karvelas*."
*Id.* at 60.  The First Circuit went on to say that

> [e]vidence that an employee objected to or reported
> receipt of instructions to promote a drug's off-label
> use, absent any evidence that those objections or
> reports concerned FCA-violating activity such as the
> submission of false claims, cannot show at the summary
> judgment stage that the employee engaged in conduct
> protected by the FCA.

*Id.*  Again, as in *Karvelas*, Booker did not engage in protected
conduct because his disagreements with his supervisor about
Pfizer's off-label marketing did not "concern[] the submission of
false claims." *Id.*  This was so even though the relators submitted
aggregate data to show that Medicaid paid numerous allegedly false
claims for off-label Geodon prescriptions. *Id.* at 58.

Applying *Karvelas* and *Booker* to this case reveals that
Lokosky did not engage in protected conduct.  Lokosky asserts that
she made numerous internal complaints at Acclarent regarding off-
label marketing, but none of those complaints "concerned FCA-
violating activity such as the submission of false claims." *Id.*
at 60.  Complaints about off-label marketing alone are not
protected conduct unless the employee connects them in some fashion
to false claims or fraud on the government. *Id.*; *see Guilfoile*,
913 F.3d at 195 ("Even in the FCA retaliation context, there must
be a reasonable connection between the alleged conduct and the
submission of claims within the purview of the FCA.").

Resisting this conclusion, Lokosky argues that her complaints about off-label marketing necessarily involved false claims because any claim for an off-label use of Stratus would be a false claim.  This is a red herring.  The relevant inquiry is not whether the off-label sales generated false claims, but rather whether Lokosky's conduct, including reports, complaints, objections, investigations, or the like, "concerned the submission of false claims."  *See id.* at 60.  Otherwise, although Lokosky's conduct might include "laudable" efforts to correct regulatory problems, it would not be protected under the FCA.  *See Karvelas*, 360 F.3d at 237.  This is true even if the complained-of off-label marketing did in fact lead to false claims.  *See Booker*, 847 F.3d at 58-60 (complaints about off-label marketing not protected conduct despite evidence that some such marketing resulted in false claims); *Karvelas*, 360 F.3d at (reports of failure to meet regulatory standards not protected conduct even though standards were required for reimbursement by Medicare and Medicaid).

Lokosky never once raised the issue of false claims to anyone at Acclarent or J&J.  Any fortuitous link that she can draw now between off-label sales and false claims does not make up for the fact that she never mentioned false claims (or claims or billing at all) while working for Acclarent.  Because Lokosky's complaints about off-label marketing were wholly unconnected to billing or the submission of false claims to the government, there is no

14

genuine dispute that she did not engage in protected conduct while employed by Acclarent, and therefore Acclarent is entitled to summary judgment on the FCA retaliation claim.[5]

**B.   Wrongful Termination in Violation of Public Policy**

Lokosky's remaining claim is that Acclarent wrongfully terminated her in violation of public policy when it fired her for raising concerns about off-label marketing.  Although the parties agree that this claim arises under state law, they disagree as to which state's law applies.  Acclarent argues that Arizona law controls because Lokosky lived and worked in Arizona throughout her employment with Acclarent.  Lokosky maintains that the claim is governed by California law under the choice of law provision in her employment contract.  As discussed below, the court finds that Arizona law applies and, further, that the wrongful termination claim is not viable under Arizona law.

---

[5] Because Lokosky did not engage in protected conduct, it follows *a fortiori* that Acclarent did not know that she was engaged in protected conduct and that it did not terminate her employment in retaliation for such conduct.  *See Karvelas*, 360 F.3d at 237 n.22 ("Where an employee has not engaged in conduct protected under the FCA, he cannot meet the second and third elements of an FCA retaliation claim, as those depend upon the first.").  It bears noting, however, that the contemporaneous explanations Lokosky provided to Acclarent for her conduct were less than consistent.  On at least two occasions, including the Western Area sales meeting, she allegedly tried to draw attention to the "inconsistent direction" sales representatives were receiving about marketing Stratus.  When seeking to charge expenses for the training event to her corporate credit card, Lokosky explicitly told J&J management that she made the request because of her personal finances.  In her recorded meeting with Cornish, Lokosky expressed her concern that she could be sued personally if a patient were harmed by a Stratus spacer implanted with a Kenalog steroid.  Finally, in her response to her second PIP, Lokosky made no mention of off-label marketing, instead alleging harassment and gender discrimination.  On these facts, it is hardly clear that Acclarent was on notice that Lokosky's internal complaints were about Acclarent violating federal law by marketing Stratus off-label, much less about Acclarent causing the submission of false claims.

1.  <u>Choice of Law</u>

Where, as here, a federal court exercises supplemental jurisdiction over state law claims, it applies the choice of law rules of the state in which it sits.  *Bi-Rite Enters., Inc. v. Bruce Miner Co.*, 757 F.2d 440, 442 (1st Cir. 1985) (citing *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)); *see also Reicher v. Berkshire Life Ins. Co. of Am.*, 360 F.3d 1, 4 (1st Cir. 2004) (applying identical rule in diversity case).  This court, therefore, looks to the choice-of-law rules of Massachusetts.

Under Massachusetts law, a claim for wrongful termination in violation of public policy sounds in tort.  *Ryan v. Holie Donut, Inc.*, 977 N.E.2d 64, 67 (Mass. App. Ct. 2012).[6]  "Traditionally, in matters of tort, the courts of [Massachusetts] apply the substantive laws of the jurisdiction wherein the tort occurred."  *Cosme v. Whitin Mach. Works, Inc.*, 632 N.E.2d 832, 834 (Mass. 1994); *cf. Bergin v. Dartmouth Pharm. Inc.*, 326 F. Supp. 2d 179, 183 (D. Mass. 2004) (quoting *Dunfey v. Roger Williams Univ.*, 824 F. Supp. 18, 21 (D. Mass. 1993)) ("Under Massachusetts choice of law rules, 'tort claims are governed by the law of the state where the alleged injury occurred, unless another state has a more significant relationship to the cause of action.'").  Here, Lokosky's employment with Acclarent was centered in Arizona.  Her

---

[6] Wrongful termination is also a tort under both Arizona and California law. *See Miklosky v. Regents of Univ. of Cal.*, 188 P.3d 629, 644 (Cal. 2008); *Cronin v. Sheldon*, 991 P.2d 231, 234 (Ariz. 1999) (en banc).

sales territory was in Arizona, where she resided.  Cornish and
Salkeld presented Lokosky with her second PIP in Arizona.  (Dkt.
No. 126, p. 10, ¶ 30).  Acclarent notified Lokosky of her
termination in Arizona.  (*Id.* at p. 11, ¶ 39).  Based on these
facts, the court concludes that the alleged wrongful termination
occurred in Arizona and that no other state has a more significant
relationship to Lokosky's termination.  Thus, Arizona law will
apply unless Lokosky's employment contract requires a different
result.

The choice of law provision in the employment contract between
Lokosky and Acclarent reads as follows: "This Agreement will be
governed by the laws of the State of California."  (Dkt. No. 133-
35, § 10A).  Under Massachusetts law, a provision providing that
the agreement will be governed by one state's law, without more,
only applies to the construction and governance of the agreement's
terms.  *Kleiner v. Cengage Learning Holdings II, Inc.*, --- F.4th
---, 2023 WL 2998996, at *3-*4 (1st Cir. 2023) (collecting cases).[7]
Lokosky does not argue that Acclarent breached her employment
contract, nor does her claim depend on the contract's terms.  The
contract itself is clear that Lokosky's employment was "at-will"
and that her employment could be "terminated at any time, with or

---

[7] The provision at issue in *Kleiner* was nearly identical to the provision in
Lokosky's employment contract: "This Agreement shall be construed and governed
according to the laws of the State of New York."  *Kleiner*, 2023 WL 2998996, at
*3.

without good cause or for any or no cause." (Dkt. No. 133-35, §
1). Instead, Lokosky asserts that Acclarent violated her
freestanding right to refuse to participate in and to report
Acclarent's alleged criminal conduct. (Dkt. No. 1, ¶¶ 92-93).
This freestanding right may be related to the employment contract,
insofar as it arises out of Lokosky's employment with Acclarent,
but it is not created by the contract or dependent its terms.
Consequently, the contract's choice of law provision does not
apply, meaning that the wrongful termination claim is governed by
Arizona law.

   2.   Application of Arizona Law

Under Arizona law, wrongful termination claims are governed
by the Arizona Employment Protection Act ("AEPA"), Ariz. Rev. Stat.
§§ 23-1501 to 23-1502. *See Cronin v. Sheldon*, 991 P.2d 231, 236
(Ariz. 1999) (en banc) (citing *Wagenseller v. Scottsdale Mem'l
Hosp.*, 710 P.2d 1025 (Ariz. 1985)) (recognizing that the AEPA
includes the common law wrongful termination cause of action first
approved in *Wagenseller*); *see also Powell v. Washburn*, 125 P.3d
373, 380 (Ariz. 2006) (en banc) (describing *Wagenseller* as
"superseded by statute"). The AEPA provides three different
theories of liability for wrongful termination:

> (1) termination in breach of a written contract (signed
> by both the employer and employee or expressly included
> in an employment handbook) setting forth that the
> employment relationship shall remain in effect for a
> specified duration of time or otherwise expressly

restricting the right of either party to terminate the
employment relationship; (2) termination in violation of
an Arizona statute . . . ; [or] (3) termination in
retaliation for the refusal to violate the Arizona
Constitution or an Arizona statute.

*Bodett v. CoxCom, Inc.*, 366 F.3d 736, 746 (9th Cir. 2004) (citing
Ariz. Rev. Stat. § 23-1501(2), (3)(a)-(d)).[8]  The second theory,
"termination in violation of an Arizona statute," also embraces
termination "in violation of the public policy arising out of the
statute."  Ariz. Rev. Stat. § 23-1501(3)(b).

In her complaint, Lokosky alleges that Acclarent "wrongfully,
and in violation of public policy, terminated [her] solely because
she refused to promote the misbranded MicroFlow Spacer."  (Dkt.
No. 1, ¶ 93).  At first glance, the mention of public policy and
Lokosky's refusal to promote Stratus could implicate either the
second or third AEPA theory.

There is, however, a significant wrinkle in Lokosky's
wrongful termination claim.  The AEPA only prohibits terminating
an employee in violation of an Arizona statute or related public
policy or because of "[t]he refusal of the employee to commit an
act or omission that would violate the Constitution of Arizona or
the statutes of [Arizona]".  Ariz. Rev. Stat. § 23-1501(3)(b)-(c).
Lokosky's claim is that Acclarent terminated her employment

---

[8] *Bodett* included a fourth theory, available only to public employees with a
right to continued employment, based on § 23-1501(3)(d).  366 F.3d at 746.  The
legislature deleted § 23-1501(3)(d) from the AEPA in 2012.  House Bill 2571,
2012 Ariz. Sess. Laws 321.

because she refused to market Stratus off-label, and complained about Acclarent's off-label marketing, in line with *federal* law.

The AEPA does not protect employees or whistleblowers from termination in violation of federal law or related public policy. *Galati v. Am. W. Airlines, Inc.*, 69 P.3d 1011, 1014-15 (Ariz. Ct. App. 2003). Lokosky has neither alleged nor provided any evidence that her termination violated any Arizona statute or that her refusal to market Stratus off-label was connected to any such statute. Accordingly, on this record, Lokosky cannot maintain an action against Acclarent under the AEPA. Acclarent is thus entitled to judgment on the wrongful termination claim.

## IV.   CONCLUSION

For the foregoing reasons, the court's previous electronic order on this motion (Dkt. No. 148) is VACATED and Acclarent's motion for summary judgment (Dkt. No. 125) is ALLOWED.


So Ordered.                          /s/ Donald L. Cabell
                                     DONALD L. CABELL, U.S.M.J.


DATED:  May 10, 2023